UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TIMOTHY A. STULL,             )
                               )
         Plaintiff,          )
                               )
     vs.                      )       Case No. 4:11CV00987 AGF
                               )
FIREMAN'S FUND INSURANCE CO.,  )
                               )
        Defendant.      )

## MEMORANDUM AND ORDER

Plaintiff brings this employment discrimination action against his former employer, Defendant Fireman's Fund Insurance Company, seeking damages under the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. § 213.010, et seq., and the public policy exception to the Missouri at-will employment doctrine.[1]  Plaintiff originally filed suit in state court, and Defendant removed the case to this Court based on diversity of citizenship.  Now before the Court is Defendant's Motion for Summary Judgment.  For the reasons set forth below, Defendant's motion will be granted.

**Background**

The record establishes the following facts, which are undisputed, except as noted:

Plaintiff, a Caucasian male, began working for Defendant on March 31, 2009, as a Workers' Compensation Claims Supervisor.  Plaintiff was an employee at will.  Prior to

_____

[1]  In his Complaint, Plaintiff also asserted a claim, in Count IV, against Phelecia Hamilton, for slander, but agreed to dismiss that claim following the filing of Hamilton's motion to dismiss.  (Doc. 11.)

his hiring, Plaintiff interviewed with Dennis Mason, an African American male, Letitia Tegue, an African American female, and Mary Pelser, a Caucasian female. Mason participated in making the decision to hire Plaintiff, and became Plaintiff's immediate supervisor.

At the outset of his employment, Defendant provided Plaintiff with its Code of Conduct. The Code of Conduct requires employees to "welcome diverse perspectives and treat others with respect." Doc. No. 38-4, at D0193. The Code further specifies higher duties for Defendant's supervisors and managers than for non-supervisory employees. Supervisors are expected to "Lead by example - ensuring that they model ethical business practices for their direct reports and other employees" and "Maintain a workplace culture that promotes ethical behavior and encourages employees to ask questions and raise concerns." (Doc. No. 38-4 at D194.)

Plaintiff supervised nine employees: four African American females, three Caucasian females, one African American male, and one Caucasian male. During the course of his employment, Plaintiff received positive performance evaluations and two performance awards, but early on issues arose with respect to one of his direct reports, Rheghetta Williams, an African American woman. During late 2009 and early 2010, Williams reported to management that Plaintiff created a hostile work environment, singled her out, and upset her unnecessarily. In February 2010, Plaintiff recommended that Williams be put on written warning, and Mason approved. In March 2010, Plaintiff

recommended that Williams' employment be terminated. Mason agreed and terminated Williams' employment for poor performance.

In March 2010, Plaintiff received a performance evaluation covering his first year of employment. In the evaluation, Plaintiff received an overall rating of "3 out of 5." Mason noted that he had spoken with Plaintiff on numerous occasions about improving his communication with his direct reports and that this was an area of weakness that Plaintiff needed to improve. The evaluation included the following comment: "Tim has been coached on leading difficult employees as well as improving the communication within the team, and we will continue to ask for improvement in this area. Tim will take on additional training and coaching in 2010 to always enforce the requirements of the position and what is expected." (Doc. No. 38-8.)

During a May 5, 2010 quality assurance meeting with his direct reports and other associated employees, Plaintiff raised his voice, lost his temper, pointed directly at those in attendance, loudly stated that he was "mad as hell," and left the room. After the meeting, one of Plaintiff's direct reports, Rhonda Warner, an African American female, reported Plaintiff's conduct to Mason. Jason Fredrick, the other supervisor present at the meeting, confirmed to Mason Warner's account of Plaintiff's conduct, and Plaintiff admitted to Mason that he had lost his temper during the meeting.

At Mason's request, Kim Tredo, a Caucasian female and human resources consultant for Defendant, agreed to investigate Warner's complaint against Plaintiff and recommend appropriate disciplinary action. On May 6, 2010, Tredo spoke with Warner

who reported that Plaintiff slammed his fist, pointed in Warner's face and yelled statements which included, "You all just have to suck it up"; "If none of you like it you can all get the hell out"; and "There's the phone, call him, call Dennis Mason"; and then left the meeting. Rhonda Westfall and DeAndrea Bonner, two employees who reported to Plaintiff, confirmed Warner's account of the meeting.

On the basis of her investigation, Tredo concluded that Plaintiff had engaged in misconduct during the May 5, 2010 meeting which violated Defendant's policies and Code of Conduct and failed to meet Defendant's expectations for a supervisor. Tredo advised Mason that Plaintiff's conduct warranted a Final Counsel for misconduct. Mason drafted the Final Counsel. On May 17, 2010, after obtaining Tredo's review and the approval of his supervisor, Frank Sapio, Mason delivered the Final Counsel to Plaintiff.

The Final Counsel described the incident and summarized a discussion Mason had with Plaintiff on May 6:

> On May 6, I discussed this issue with you and advised you that this behavior is unaceptable and will not be tolerated in the work environment. You were informed that this behavior was unprofessional, disruptive, and had a negative impact to both your team and your peer's team. The communication and behavior you displayed did not reflect the FFIC Shared Values and Personal Conduct Policies. I expect you to communicate in a professional and constructive manner at all times, regardless of whether you are addressing a difficult issue or a routine one. As a supervisor, it is critical that you communicate in a way that demonstrates respect for others and encourages open dialogue among your teams.

The Final Counsel required Plaintiff to "immediately refrain from any future verbal outburst of this nature and stated that any further occurrence of this or similar behaviors may result in immediate termination of your employment." (Doc. No. 39-7.)

Mason further advised Plaintiff that his behavior at the May 5 meeting had been unacceptable and should not be repeated. Plaintiff testified at deposition that he was aware that as a result of his conduct at the May 5, 2010 meeting he was being placed on final warning, and that future verbal outbursts would result in termination of his employment. Upon receiving the Final Counsel document, Plaintiff wrote the words, "[t]his will not happen again" on the document.

In June of 2010, Plaintiff received a Mid-Year Review which provided:

> [Plaintiff ] need[s] to improve on his interpersonal relationship with the staff that reports to him. [Plaintiff] has managed his way through an incident in 2010,[2] and the work will be part of his remaining efforts in 2010 as he continues to build the respect and dignity of all the members on his team and the confidence they have in his support of their efforts. [Plaintiff] has been coached on this improvement issue and his need to resolve it as soon as possible.

(Doc. No. 38-10.)

On August 25, 2010, Plaintiff met with one of his direct reports, Phelecia Hamilton, an African American female, regarding her failure to follow timekeeping procedures. Mason had previously issued a verbal warning to Hamilton in June of 2009, with Plaintiff present, regarding her failure to return customers' phone calls. Also in 2009, Mason supported Plaintiff's request to coach Hamilton on proper etiquette after Plaintiff received complaints from other employees regarding Hamilton's eating habits, gum chewing, and loud voice. During the August 25, 2010 meeting, Hamilton said she

---

[2] The parties agree that the incident referred to in the Mid-Year Review was the team meeting on May 5, 2010. (Doc. No. 38-1, at 161:1-7.)

was "uncomfortable" and asked Plaintiff to get Mason on the phone. Plaintiff did so, but because Plaintiff and Hamilton were talking over each other, Mason was unable to understand the issue being discussed, and he arranged instead to speak with them individually. After the meeting between Plaintiff and Hamilton, some employees observed Plaintiff slamming his notepad on his desk and saying, "I am sick of this shit" or "bullshit."

Plaintiff issued a verbal warning to Hamilton on August 26, 2010, regarding the policy and use of codes for signing in and out when not at one's desk. Around this same time, Mason refused Plaintiff's request to give Hamilton an additional verbal warning regarding her failure to return customers' phone calls. Plaintiff acknowledged that with this single exception, Mason supported all of Plaintiff's requests to counsel or discipline members of his team. (Doc. No. 38-1 at 118:12-17.)

On or about August 30, 2010, Hamilton filed a complaint with Human Resources stating that Plaintiff had engaged in "inconsistent management or unethical discrimination" and stating that after the August 25 meeting Plaintiff slammed down his notepad in a violent manner, and said, "I am sick of this shit."

The following day, on August 31, 2010,[3] Plaintiff received a complaint from a workers' compensation claimant concerning Hamilton's alleged failure to return the

---

[3]     Although Plaintiff stated in written discovery that the complaint from the customer, Mr. Kirby, occurred on August 25, 2010, in his deposition Plaintiff corrected the timing and acknowledged that the Kirby complaint occurred on August 31, 2010. (Doc. 38-1 at 238-39.)

claimant's phone calls and a delay in the issuance of a settlement check. Plaintiff believed that Hamilton's conduct violated the Missouri Unfair Claims Practices Act, Mo. Rev. Stat. § 375.1000 *et seq.*, because she allegedly asked the claimant to fax his receipt three times and told him that a settlement check had been issued when it had not. (Doc. No. 38-1 at 245:8-246:14; 258:20-259:2.) Plaintiff reported this conduct and his concerns to Mason in an email dated September 1, 2010,[4] and also reported Hamilton's conduct to human resources personnel. Mason directed Plaintiff to meet with Hamilton to address the situation. Plaintiff then met with Hamilton and advised her of the customer complaint and his own concerns regarding her handling of the claim. In his deposition, Plaintiff acknowledged that Mason supported Plaintiff's discipline of Hamilton concerning the customer complaint. (Doc. No. 38-1 at 254:3-5.)

Meanwhile, Renee Henry, a Caucasian female and human resources consultant, investigated Hamilton's complaint regarding Plaintiff's conduct on August 25. Plaintiff testified that he did not remember making the statement, "I'm sick of this shit," but did not deny making it. (Henry Dec. ¶ 12; Doc. No. 38-1 at 230:4-14.) Certain employees with whom Henry spoke during the course of her investigation reported hearing Plaintiff's outburst and the specific language reported by Hamilton. Other employees reported hearing Plaintiff say "this is ridiculous" and slamming things on his desk. At the end of August or beginning of September, 2010, Henry contacted Tredo and advised her

---

[4]    In his sworn declaration Mason stated that Plaintiff never complained that Hamilton's conduct was illegal. Mason Dec. ¶ 43.

there had been another complaint regarding Plaintiff (namely, the complaint regarding Plaintiff's conduct on August 25) and that multiple employees reported hearing Plaintiff say he was "sick of this shit" or "bullshit."

On approximately September 2, 2010, Plaintiff held a meeting with Mason and Plaintiff's direct reports to discuss employee morale. Plaintiff organized the meeting due, in part, to the fact that Mason had advised Plaintiff that Plaintiff's team had the worst morale of any team in the entire company. Before the meeting, Plaintiff asked his direct reports to formulate questions and issues for discussion at the meeting and to provide criticism of his performance as a supervisor, the team's performance, and Mason's performance. These items were compiled in a list by Ms. Bond for use at the meeting. During the meeting, the team discussed Plaintiff's leadership skills and what could be done to improve morale. During the meeting, Hamilton was highly critical of Plaintiff's management style. Hamilton stated Plaintiff acted like Hitler in the office, had unnecessary rules, did not know how to communicate with people, and needed to be more approachable about problems. After the meeting, Plaintiff filed a human resources complaint against Hamilton charging that she had made slanderous, insubordinate statements. Specifically, he asserted that during the course of the meeting she had compared Plaintiff to Hitler, objected to rules he imposed as unnecessary, and criticized his communication skills.[5]

---

[5]     In his deposition, Plaintiff acknowledged that everything Hamilton said at the meeting, aside from stating he acted like Hitler and questioning his professional background, was on the list compiled by Bond at Plaintiff's request.

Human resources, which was already investigating Plaintiff's conduct after the August 25 meeting, also investigated Plaintiff's complaint regarding Hamilton's conduct. At the close of this investigation, which included discussions with individuals who were present, Henry concluded that Hamilton had in fact compared Plaintiff to Hitler, but that she did not yell or engage in threatening conduct during the meeting. Human resources recommended a verbal reprimand as the appropriate disciplinary action. On September 17, 2010, Mason delivered the verbal reprimand to Hamilton for her statement comparing Plaintiff to Hitler. The reprimand was reiterated in an email that same day.

At the conclusion of the investigation regarding Plaintiff's conduct after the August 25 meeting with Hamilton, Henry consulted Tredo and determined on the basis of the investigation that Plaintiff's verbal outbursts after the individual meeting with Hamilton were the types of misconduct for which he was already on a Final Counsel. In their sworn statements Henry and Tredo attested that they did not consider Plaintiff's race or gender in concluding that he made the statement that he was "sick of this shit" or "bullshit," and in concluding that he had engaged in misconduct for which he was already on a Final Counsel.

In early September 2010, Tredo advised Mason of the result of the investigation involving Plaintiff and that termination was the appropriate disciplinary action. Mason drafted a Termination Recommendation for Plaintiff's discharge which Tredo and other human resources consultants reviewed and Sapio approved. In his sworn statement, Mason stated that he did not consider Plaintiff's race or gender in making

recommendations on disciplinary action or termination. Mason Dec. ¶ 47. On September 15, 2010, Defendant terminated Plaintiff for the repetition of behavior for which he had received a final warning. (Doc. No. 38-12.)

Plaintiff filed a timely charge of discrimination against Defendant with the Missouri Commission on Human Rights, alleging discrimination and retaliation on the basis of race, gender and age.[6] Specifically, Plaintiff alleged that Defendant violated the MHRA by discharging him for his conduct, but giving preferential treatment to, or failing to discipline African American female employees for misconduct, slanderous statements, or insubordination.

## Applicable Law

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, a court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the record. *Fercello v. Cnty. of Ramsey,* 612 F.3d 1069, 1077 (8th Cir. 2010). In this context, a court is not permitted to "weigh evidence or make

---

[6] Although Plaintiff alleged in his charge that Mason made hiring decisions which favored younger, female African American candidates for the open positions, Plaintiff has abandoned his age discrimination claims, and does not assert age-related claims in his complaint or summary judgment filings.

credibility determinations." *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003).

The initial burden of demonstrating the absence of a genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)). However, "'[m]ere allegations not supported with specific facts are insufficient to establish the existence of a material issue of fact and will not withstand a summary judgment motion.'" *Depositors Ins. Co. v. Wal-Mart Stores, Inc.,* 506 F.3d 1092, 1095 n.3 (8th Cir. 2007) (quoting *Henthorn v. Capitol Commc'n, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004)). Only the existence of a "genuine issue of material fact" will defeat a summary judgment motion. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). An issue of fact is genuine if it has a real basis in the record, and a genuine issue of fact is material if it "'might affect the outcome of the suit under the governing law.'" *Id.*, 653 F.3d at 751 (quoting *Anderson,* 477 U.S. at 248).

**Missouri Human Rights Act Claims**

In Counts I and II of his complaint, respectively, Plaintiff alleges that Defendant violated the MHRA by terminating him based on his race and gender. Under the MHRA, an employer is prohibited from discharging or otherwise discriminating against an

11

individual based upon race or gender. Mo. Rev. Stat. § 213.055. The MHRA defines discrimination as "any unfair treatment" based on a protected characteristic. *Id.* at § 213.010(5). To establish a prima facie case of discrimination in the workplace, a plaintiff must show that he (1) was a member of a protected class; (2) was qualified to perform his job; (3) suffered an adverse employment action; and (4) was treated differently from a similarly situated person not a member of the protected class. *Ressler v. Clay County,* No. WD 73601, 2012 WL 2285980, at *7 ( Mo. Ct. App. Jun. 19, 2012). The fourth element also can be proved by "other evidence that would give rise to an inference of unlawful discrimination." *Ruppel v. City of Valley Park*, 318 S.W.3d 179, 185 (Mo. 2010) (internal quotation omitted).

Discrimination may be proved by direct or by indirect evidence. *Trickey v. Kaman*, No. 1:09CV26 SNLJ, 2011 WL 2648585, at*5 (Jul. 5, 2011). Direct evidence is that which provides "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision." *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 n.4 (Mo. 2007). "Direct evidence of discrimination may include evidence of 'actions or remarks . . . uttered by individuals closely involved in employment decisions," if those comments are related to the decisional process. *Stanley v. JerDen Foods, Inc*., 263 S.W.3d 800, 804-05 (Mo. Ct. App. 2008) (internal quotations omitted); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989); *Campos v. City of Blue Springs, Mo.*, 289 F.3d 546, 552 (8th Cir. 2002). Indirect

evidence of discrimination is that which gives rise to an inference of discrimination and may derive from a comparison of the manner in which an employer treats similarly situated individuals. *See Ruppel*, 318 S.W.3d at 185. In discrimination cases, proof by way of indirect evidence is more common than by direct evidence because "employers are shrewd enough to not leave a trail of direct evidence." *E.E.O.C. v. Liberal R–II Sch. Dist.*, 314 F.3d 920, 923 (8th Cir. 2002).

The Missouri Supreme Court has determined that the MHRA may offer greater discrimination protection than that available under federal standards, and that federal case law contrary to the plain meaning of the MHRA should not be applied to cases under the statute. *Daugherty*, 231 S.W.3d at 818. This distinction led the Missouri Supreme Court to abandon the *McDonnell Douglas* burden-shifting analysis[7] in MHRA cases, applying instead a standard derived from Missouri's approved pattern jury instruction, MAI 31.24. *Id*. at 820.

Under this standard, an MHRA discrimination claim survives summary judgment only "if there is a genuine issue of material fact as to whether [the protected characteristic] was a 'contributing factor' in [defendant's] termination decision." *Id*. (citing MAI 31.24); *see also McCullough v. Commerce Bank*, 349 S.W.3d 389, 398 (Mo. Ct. App. 2011) (discussing and applying *Daugherty*)*; Korando v. Mallinckrodt, Inc.*, 239 S.W.3d 647, 649 (Mo. Ct. App. 2007) (citing *Daugherty* for the proposition that "the McDonnell

---

[7] The rejected federal standard is set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-03 (1973).

Douglas burden shifting analysis no longer applies" and "the proper analysis for summary judgment cases under the MHRA applies the MAI 31.24 'contributing factor' standard"). This standard offers greater protection than the federal one because a "contributing" factor need only have "a part in producing the [discriminatory] effect." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 867 (Mo. Ct. App. 2009) (internal quotations omitted); *see also Holmes v. Kansas City Mo. Bd. of Police Comm'rs*, 364 S.W.3d 615, 627 (Mo. Ct. App. 2012). If "the record shows two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' in the case is real, not merely argumentative, imaginary, or frivolous" a plaintiff will have demonstrated the existence of a contributing factor for purposes of a motion for summary judgment. *Daugherty*, 231 S.W.3d at 820; *see also Marez v. Saint-Gobain Containers, Inc.,* 740 F. Supp. 2d 1057, 1068 (E.D. Mo. 2010).

In light of this more protective standard, and because such cases are inherently fact-based and often turn upon inferences rather than direct evidence, Missouri courts have recognized that summary judgment will seldom be granted in employment discrimination cases under the MHRA. *Daugherty*, 231 S.W.3d at 818 n.4; *Ruppel*, 318 S.W.3d at 185. Nevertheless, on the record before it, the Court concludes that Plaintiff has failed to create a genuine issue of material fact that either his race or his gender was a "contributing factor" in Defendant's decision to terminate him.

Defendant has submitted the sworn statements of the persons responsible for the decision to the effect that they did not consider either Plaintiff's race or his gender in

terminating Plaintiff's employment. The record supports their contention that Plaintiff was terminated because he did not display the demeanor required of a supervisor and had persisted in conduct for which he had been previously disciplined and given a final warning. The burden then falls to Plaintiff to establish material issues of fact with regard to his claims. The record must demonstrate that "the 'genuine issue' in the case is real, not merely argumentative, imaginary, or frivolous." *Daugherty*, 231 S.W.3d at 810.

In opposition to Defendant's motion, Plaintiff offers no direct evidence, whatsoever, of discrimination. Nor does Plaintiff offer any indirect evidence sufficient to create a reasonable inference of discrimination. Moreover, Plaintiff fails to offer a plausible account of the facts which would allow a jury to find that either his race or his gender was a contributing factor in that decision. *Notorangelo v. Fed. Express Corp.,* No. 4:07CV570 DJS, 2008 WL 4539279, at *6 (E.D. Mo. Oct. 7, 2008).

In support of his assertion that discrimination was a contributing factor in his termination, Plaintiff asserts that African Americans and females were given preferential treatment. In his complaint, Plaintiff alleges that during his employment with Defendant, African American employees were treated more favorably than Caucasian employees, including Plaintiff, and that female employees were treated more favorably than male employees. By way of example, Plaintiff alleges that Mason, who is African American, did not discipline African American employees and female employees who had violated various Company policies and State claims handling regulations and that Mason and the Human Resources Department gave African Americans and females preferential treatment.

Plaintiff also alleges that Mason (presumably referencing Hamilton), "allowed African American [and female] employees to violate Company policies and procedures, including making slanderous comments about Plaintiff in the presence of other employees, violating Company timekeeping procedures, engaging in unfair claims practices, and making insubordinate comments about Plaintiff and Company management."

In his memorandum in opposition to the motion for summary judgment,[8] Plaintiff contends that Hamilton, DeAndrea Bonner, and to a certain extent Warner violated company policies and regulations. In particular, Plaintiff alleges that Hamilton violated customer service policies with regard to returning phone calls promptly, "handling cases with the law and regulations of the state," proper timekeeping, proper documentation of files, prompt maintenance of a diary system and FileNet materials. He further asserts that DeAndrea Bonner "violated the policy with regard to timekeeping, falsifying her timecards." (Doc. 38-1, 204-205.) As to Warner, Plaintiff could cite only to the fact that she exceeded the volume of mail she was allowed to keep on the electronic mail system. He then claims that they were not reprimanded in any way.

---

[8] To support his claims of preferential treatment, Plaintiff cites primarily to his statement of undisputed facts, and specifically paragraphs 10-13, which facts were not admitted by Defendant. The Court notes that as record support for these "facts," Plaintiff cites primarily to a few pages from his own deposition, and to paragraphs of his complaint and MHRC charge. Of course, neither the allegations in Plaintiff's complaint nor the conclusory allegations of the MHRC charge will suffice to create an issue of fact in the context of a summary judgment motion. *See* Fed. R. Civ. P. 56(c); *Depositors Ins. Co.,* 506 F.3d at 1095 n.3.

Accepting as true Plaintiff's allegations regarding the conduct of Bonner and Warner and Defendant's response thereto, this evidence does not support an inference of discrimination. The test for whether employees are "similarly situated" is a "rigorous" one. *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994). For discriminatory discipline claims, "[e]mployees are similarly situated when they are involved in or accused of the same offense and are disciplined in different ways." *Id*. It is undisputed that Hamilton and Williams were not supervisors and that they performed different functions than Plaintiff. In addition, the record establishes that their misconduct was not the same as Plaintiff's. Maintaining too many emails on the system and employing improper timekeeping procedures are not at all comparable to abusive outbursts and unprofessional, aggressive conduct by a supervisor directed at those he is supervising. Nor was Plaintiff aware of any male or Caucasian employees who had committed violations similar to Bonner's who were disciplined differently or more severely.

Further, the record fails to support Plaintiff's contention that Bonner and Warner received preferential treatment or were not disciplined. In his own deposition, Plaintiff acknowledged that he did not have any basis for his allegation in the Charge of Discrimination that African American females violated company policies and state claims handling regulations and were not reprimanded in any way. (Doc. 38, ¶123, admitted by

Plaintiff.)  He testified that he did not know, one way or the other whether Mason

reprimanded these employees after Plaintiff reported the conduct to him.[9]

Relying on a recent decision of the Missouri Court of Appeals in *Holmes,* Plaintiff

urges the Court to find that Missouri's adoption of the "contributing factor" rubric

precludes reference to the question of whether a plaintiff was treated less favorably than

similarly situated employees outside of his protected class.  *Holmes*, 364 S.W.3d at 627

n.6.  The Court disagrees.  Although, as previously noted, the *McDonnell Douglas*

burden-shifting analysis does not apply in MHRA cases, after *Daughtery* a plaintiff may

still prove allegations of discriminatory treatment by demonstrating that he was treated

less favorably than similarly situated employees outside his protected class.  *Buchheit, Inc.*

*v. Missouri Comm'n on Human Rights*, 215 S.W.3d 268, 277 (Mo. Ct. App. 2007)*; see*

---

[9]    Q: You say in your statement sworn under oath in Exhibit 26 that they were
not reprimanded in any way.  My point is: You don't even know if that's
true, do you?

A.  I was not privileged to the conversation.  I would say by their
conduct after the so-called instructions by Dennis Mason, there was no
change in their behavior, nor in their action, so I would have to assume that
nothing happened.

Q.  Mr. Stull, you signed under penalty of perjury that the statements
you submitted to the EEOC were correct.  My point is: Where you say,
These younger African-American females were not reprimanded in any
way, you have no basis for that – for that statement to swear under oath;
isn't that true?

A.  It would, right.

(Doc. 38-1, at 208-09.)

*also Goliday v. GKN Aerospace-St. Louis Aerospace*, No. 4:11CV729 JCH, 2012 WL 2885358, at *9 (E.D. Mo. Jul. 13, 2012); *Marez*, 740 F. Supp. 2d at 1067.

The analysis with respect to Hamilton's conduct and Defendant's response fails for the same reasons. Like Bonner and Warner, Hamilton was not a supervisor. And failing to return customer calls in a timely manner, failing to use proper timekeeping procedures, and displaying improper etiquette are not at all comparable to the conduct for which Defendant was disciplined. Further, Plaintiff acknowledges that prior to August 2010, Mason accepted and permitted all of the discipline that Plaintiff himself requested with respect to Hamilton. The only exception Plaintiff can point to is with respect to his request that she be given a verbal warning for failure to return customer calls.

Even if one accepts Hamilton's conduct at the morale-building meeting as similar to Plaintiff's conduct, she is still not "similarly situated" to Plaintiff. To the extent that she raised her voice, was insubordinate, and inappropriately compared Plaintiff's management style to Hitler's, she was not a supervisor, and Defendant made plain in its policies that it imposed higher duties and standards of behavior on supervisors. In addition, unlike Plaintiff, she also had not been previously warned about this particular behavior. Plaintiff can point to no African American or female supervisor who engaged in conduct similar to his own who was treated differently.

Plaintiff also points to the fact that he received a Final Counsel rather than the verbal or written warnings Hamilton received. This fact is unpersuasive because it is undisputed that before Plaintiff received the Final Counsel, Mason had already counseled

him about this very conduct, and in Plaintiff's evaluation, emphasized the importance of correcting it.  Finally, Plaintiff's termination came only after he repeated the behavior for which he was warned in the Final Counsel.

Plaintiff has not set forth evidence of "disparate discipline afforded [to African American females] for similar acts, 'hav[ing] probative force upon the issues, and from which the trier of fact [could] reasonably decide the case.'" *See Holmes,* 364 S.W.3d at 627 (quoting *Williams*, 281 S.W.3d at 867).   Rather, the undisputed evidence on the record shows that Williams was terminated and Hamilton was given a verbal warning, and that they were disciplined for conduct markedly different from Plaintiff's.  Finally, Plaintiff offers no evidence that he was sanctioned more severely for comparable behavior. *See, e.g., Schmidt  v. Am. Retail Corp.*, No.09-64-DLB, 2010 WL 5093094, at *13 (E.D. Ky. Dec. 7, 2010) (applying Missouri law under the MHRA)*; Notorangelo*, No. 2008 WL 4539279, at *7.  As such, Plaintiff offers no indirect evidence of such discrimination because the record is devoid of factual support for his contention that similarly situated employees were treated differently than he.   *See, e.g., Harrington v. Bootheel Counseling Services, Inc.*, No. 1:10CV00019 LMB, at *6 (E.D. Mo. Apr. 6, 2012).  Nor has he offered direct or other indirect evidence of discrimination as a factor contributing to his termination.

On the basis of the foregoing, the Court concludes that Plaintiff has failed to demonstrate a genuine issue of material fact that his race or his gender was a contributing factor in his termination.

## Missouri's Public Policy Exception to At-Will Employment

Under Missouri law an employer may terminate an at-will employee for any reason or for no reason. *See Margiotta v. Christian Hosp., Ne. Nw.*, 315 S.W.3d 342, 345 (Mo. 2010). Missouri courts recognize, however, a narrowly drawn public-policy exception to the at-will-employment rule. *Id.* 345. Courts have described four categories of claims under the public policy exception. Specifically, an employee has a cause of action when he has been discharged for: (1) refusing to perform an illegal act or an act contrary to a strong mandate of public policy; (2) reporting the employer or fellow employees to superiors or third parties for their violations of law or public policy; (3) acting in a manner public policy would encourage; or (4) filing a claim for worker's compensation. *Delaney v. Signature Health Care*, No. 97419, 2012 WL 1854257, at*1 (Mo. Ct. App. May 22, 2012).

Plaintiff's claim falls into the second or whistle blower category. *See, e.g., Margiotta*, 315 S.W.3d at 347; *Bazzi v. Taco Healthcare Group, LP*, 652 F.3d 943, 948 (8th Cir. 2011). To prevail on a whistle blower claim, a plaintiff must show that the reported conduct constitutes a serious violation of the law or clearly mandated public policy.[10] *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W. 3d 81, 91 (Mo. 2010); *Frevert v. Ford Motor Co.*, 614 F.3d 466, 471 (8th Cir. 2010). "[M]ere citation" of a statute or

---

[10] Defendant asserts that Missouri courts require whistle blower claimants to make reference to specific statutory violations rather than statements of public policy. *See, e.g.*, *Margiotta*, 315 S.W.3d at 347. The Court need not decide this issue, as Plaintiff fails to offer sufficient evidence of either a statutory violation or contravention of public policy.

regulation without a demonstration of how the reported conduct violated it cannot form the basis for application of the public policy exception." *Margiotta*, 315 S.W.3d at 347. "The pertinent inquiry . . . is whether the [cited statute] clearly prohibits the conduct at issue in the action." *Id*. at 348. And a plaintiff must show that he had an objectively reasonable, good-faith belief that the reported conduct violated the law or a clearly established public policy. *Bazzi v. Taco Healthcare Group, LP*, 652 F.3d at 948. Finally, "[e]xclusive causation is not required to satisfy the public-policy exception." *Fleshner*, 304 S.W.3d at 93 (internal quotation omitted). Instead, a plaintiff need only prove that his whistle blowing was "a contributing factor" in the employer's discharge decision. *Id*. at 94-95.

In support of its motion for summary judgment, Defendant asserts that Plaintiff cannot establish that the reported conduct constitutes a serious violation of the law. The Court agrees with this assertion. Plaintiff alleged that Hamilton's failure to respond promptly to telephone calls and to provide either the accurate or the requested information in the course of processing workers' compensation claims violated the Unfair Claims Settlement Practices Act, Mo. Rev. Stat. §§ 375.1000 to 375.1018. But that statute, by its terms, does not apply to workers' compensation claims like those processed by Defendant. *See* Mo. Rev. Stat. § 375.1000.[11] Moreover, even if the Court assumes that the statute

---

[11]     The pertinent section of the Unfair Claims Settlement Practices Act, Mo. Rev. Stat. §§ 375.1000 to 375.1018  provides as follows:

Citation--purpose--construction
1. Sections 375.1000 to 375.1018 may be cited as the "Unfair Claims Settlement Practices Act."
2. The purpose of sections 375.1000 to 375.1018 is to set forth standards

evinces a public policy generally applicable to workers' compensation claims processing, it nonetheless requires more than occasional failures to promptly respond to telephone inquiries or requests for information or payment. *See* Mo. Rev. Stat. § 375.0075. To violate the statute or the policy it evinces, such actions must be committed with "conscious disregard" of the statutory requirements and with such "frequency [as] to indicate a general business practice." *Id*.

On summary judgment a plaintiff may not rest on his allegations regarding the reported conduct, but must "substantiate the allegations with sufficient probative evidence that would permit a finding in [his] favor." *Frevert,* 614 F.3d at 473-74 (quotations and citation omitted). In this case, Plaintiff has not done so. In response to Defendant's motion he offers only the e-mails in which he reported Hamilton's conduct to his superiors. He has come forward with no evidence indicating that Hamilton acted in conscious disregard of any legal requirements related to claims collection practices. Nor has he shown that she engaged in such conduct with sufficient frequency that it amounted to Defendant's general business practice. In addition, there is no evidence in the record that Plaintiff's assertions regarding Hamilton's claims collection practices played any role, much less contributed to, the decision to terminate Plaintiff for repeated misconduct unrelated to claims collections.

---

for the investigation and disposition of claims arising under contracts or certificates of insurance. **It is not intended to cover claims involving workers' compensation, fidelity, surety ship or boiler and machinery insurance.** (emphasis supplied).

For these reasons, Defendant's motion for summary judgment with respect to Count III,

Plaintiff's claim under the public policy exception, will be granted.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is

**GRANTED**.  (Doc. No. 36.)

A separate judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE


Dated this 4th day of September, 2012.